IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

SHERRY KENNEDY,

               Plaintiff,

    v.                                   8:09-CV-00143 (GTS/DEP)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

APPEARANCES:               OF COUNSEL:

FOR PLAINTIFF:

PAREIRA LAW OFFICE        JUDITH A. PAREIRA, ESQ.
129 Main Street, Suite 5
Saranac Lake, NY 12983

FOR DEFENDANT:

HON. RICHARD HARTUNIAN    DENNIS J. CANNING, ESQ.
United States Attorney         Special Assistant U.S. Attorney
Northern District of New York
Post Office Box 7198
100 South Clinton Street
Syracuse, NY 13261-7198

OFFICE OF THE GENERAL     STEPHEN CONTE, ESQ.
COUNSEL - REGION II        Acting Regional Chief Counsel
26 Federal Plaza – Room 3904
New York, NY 10278         CHRISTOPHER BRACKETT, ESQ.
                           Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Sherry Kennedy, who suffers from renal calculi and persistent pain associated with surgeries to address that condition, collagenous colitis, and borderline intellectual functioning, has commenced this proceeding pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of her application for supplemental security income ("SSI") benefits under the Social Security Act ("Act").  In support of her challenge, plaintiff asserts that the determination upon which the agency's denial hinges, to the effect that she was not disabled at any relevant point in time, is not supported by substantial evidence in the record and resulted from reliance upon flawed vocational expert testimony, the improper rejection of contrary opinions given by two of her treating physicians, and failure to properly evaluate her claims of pain.  As relief, plaintiff seeks an order reversing the Commissioner's determination and directing a finding of disability, with a corresponding remand of the matter for the limited purpose of calculating benefits owed.

Having reviewed the record now before the court, considered in light of the parties' respective contentions and applying the requisite deferential review standard, I am unable to conclude that the determination of no

2

disability is supported by substantial evidence.  For the reasons set forth below, I find that in arriving at his determination of no disability the administrative law judge ("ALJ") assigned to decide the matter inappropriately discounted the opinions of plaintiff's treating sources, did not properly assess plaintiff's credibility, and relied upon opinions of the vocational expert, which were based upon unsupported hypothetical facts.

I.    BACKGROUND

The plaintiff was born in November of 1964 and was forty-one years old when the ALJ's issued his decision in this matter.  Administrative Transcript at pp. 19, 106, 151.[1]  Plaintiff is divorced and lives in Tupper Lake, New York with her fiancé and two children, who were ages twelve and sixteen at the time of the hearing.  AT 107, 319, 491.  Ms. Kennedy is of borderline intellectual ability and attended special education classes through the ninth grade, at which point she dropped out of school.[2]  AT 17, 19, 69, 150.  Since leaving school the plaintiff has made repeated,

---

[1]      Portions of the administrative transcript, Dkt. No. 7, which was compiled by the Commissioner and is comprised in large part of the medical records and other evidence that was before the agency when its decision was made, will be cited hereinafter as "AT __."

[2]      In March of 2003, Wechsler Adult Intelligence Scale-III (WAID-III) testing of the plaintiff conducted by Dr. David E. Meeker yielded a full-scale score of 72, a score consistent with a finding of borderline intellectual functioning.  AT 16, 67.

unsuccessful attempts to complete her general educational development ("GED") degree with the assistance of a tutor.  AT 60, 493, 495.

In the past, the plaintiff has worked casually in different settings, including as a personal assistant and cashier clerk; both of those positions required her to engage in considerable lifting, but were unskilled in nature. AT 68-69, 494-95.  Plaintiff worked most recently as a personal assistant at the Adirondack Association for Retarded Citizens where she assisted disabled individuals with household chores and grocery shopping, a job which also involved lifting.  AT 143, 155, 495.  Plaintiff left that job on January 6, 2003 in order to undergo surgical repair of a hernia, and she has not engaged in any significant work activity since that time.  AT 14, 70, 319.

Plaintiff suffers from several diagnosed physical and mental conditions.  Among them is a reported history of marijuana and cocaine abuse, although she claims not to have used either substance within five years prior to November, 2004, the time of the first hearing in this matter. AT 509.  Plaintiff also experiences pain associated with surgery undertaken to both remove her right kidney and repair her right flank hernia as well as collagenous colitis – a condition that causes her to have

at least ten bowel movements each day.[3]

Plaintiff has received medical treatment for her various conditions from Dr. Irwin Lieb of the Adirondack Medical Center, dating back at least to 1994.  AT 213-93.   Between 1996 and 2002, she was treated for recurring kidney stones, a condition known as renal calculi,[4] for which she underwent several operations.  AT 226-86.  By 2002, the plaintiff had developed a massive right flank hernia[5] with multiple loops of bowel within the subcutaneous space of the right flank, due in part to her right renal calculi.  AT 220, 229, 232, 496.

On January 8, 2003, the plaintiff underwent a coordinated surgery during which Dr. Lieb removed her kidney and Dr. Claude Roland repaired her right flank hernia with mesh.  AT 220-22.  Unfortunately, while performing his part of the operation Dr. Roland was unable to find enough

---

[3]     Collagenous colitis is an inflammation of the colon of unknown etiology, characterized by deposits of collagenous material beneath the epithelium of the colon, with crampy abdominal pain and marked reduction in fluid and electrolyte absorption, leading to watery diarrhea; there is no mucosal ulceration associated with the condition.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 390 (31st ed. 2007).

[4]     Renal calculi is a urinary calculus in the kidney, and is also commonly referred to as a kidney stone.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 276 (31st ed. 2007).

[5]     A right flank hernia is a protrusion of a loop or knuckle of an organ or tissue through the side of the body inferior to the ribs and superior to the ilium. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 722, 859 (31st ed. 2007).

abdominal muscle to attach the mesh to and instead affixed it to the

erector spinae group.  AT 221, 496.  In his operative note Dr. Roland

wrote that although he deemed the repair to be satisfactory, he was

concerned that the area to which the patch was secured consisted mostly

of muscle with very little fascia.   AT 221.  According to the plaintiff, when

she coughs or bends over the mesh expands, forcing her to push it in.  AT

496.

Following the surgery plaintiff continued to treat with Dr. Roland.  AT

322-38.  Treatment notes from Dr. Roland reveal that plaintiff complained

of fairly constant pain for which he prescribed Darvocet and referred her to

physical therapy.[6]  AT 287-94, 336, 338.  Dr. Roland wrote on February 4,

2003 that the plaintiff was having fairly severe back pain when standing or

walking for more than twenty minutes at a time, but that he expected this

pain to result from plaintiff's stitches.  AT 334.  On that date Dr. Roland

also opined that the plaintiff showed no evidence of recurrent hernia and

─────────────────────

[6]     Darvocet is trade name for a combination preparation consisting of a
combination of propoxyphene napsylate and acetaminophen.  DORLAND'S
ILLUSTRATED MEDICAL DICTIONARY 479 (31st ed. 2007).  Dr. Roland noted that the
Darvocet was prescribed in order to replace the plaintiff's prior prescription of
Percocet.  AT 336.  There is no mention in earlier notes, however, as to what
dosage of Percocet the plaintiff was taking.

that her incision was clear.  *Id.*  During a subsequent visit in February 2003, Dr. Roland observed that the plaintiff experienced tenderness along the posterior aspect of the hernia repair, but noted once again that he anticipated her having this pain, and therefore was not surprised.  AT 333. Dr. Roland also stated that he felt that the plaintiff was disabled secondary to the hernia repair, risk of recurrence, and chronic pain.  *Id.*   In March 2003, the plaintiff reported to Dr. Roland that the pain was "becoming quite old" and that she was "reaching the point where she would probably want something done in the near future" to relieve the pain.  AT 331.

Plaintiff returned to see Dr. Roland in April 2003.  AT 328.   In his report of that visit the doctor noted that a computed tomography ("CT") scan performed in March showed that from a radiographic standpoint, the plaintiff's surgery had yielded an excellent result.  AT 328.  During that visit the plaintiff nonetheless reported experiencing persistent pain at the posterior aspect of her hernia repair, as well as a recurrence of nausea prompted by food intake.  *Id.*  Dr. Roland's notes of a subsequent visit on September 2, 2003 reveal that the plaintiff's pain was reported as unrelenting and unchanged and that she was prescribed Lortab[7] and

_____

[7]      Lortab is tradename for a preparation which combines hydrocodone bitartrate and acetaminophen.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1090

7

referred to a pain specialist.[8]  AT 326.

On September 10, 2003, plaintiff again treated with Dr. Roland, continuing to complain of "severe unremitting pain and tenderness along the right erector spinae region" as well as nausea.  AT 325.  On that occasion, the plaintiff was diagnosed as suffering from chronic pain syndrome, secondary to stitches in the erector spinae group, and it was indicated that the possibility of steroid/local anesthetic injection could be considered in addition to the 120 Loritab tablets prescribed.  *Id.*

On October 28, 2003, Dr. Roland performed a Lidocaine[9] injection into the skin and deeper tissues around plaintiff's lumbar erector spinae. AT 324.  While during a follow-up visit on November 4, 2003 plaintiff reported experiencing symptomatic relief improvement for a brief period, she also noted that the symptoms had recurred, and that she borrowed a transcutoaneous electrical nerve stimulation ("TENS") unit from a friend in

_____

(31st ed. 2007).

8    In notes of a later visit on October 10, 2003, plaintiff informed Dr. Roland that she was not contacted by the specialist recommended by his office. AT 325.

9    Lidocaine is a drug having anesthetic, sedative, analgesic, anticonvulsant, and cardiac depressant tendencies, and is ordinarily used as a local anesthetic, applied topically to the skin and mucous membranes.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1049 (31st ed. 2007).

order to experiment with it.  AT 324.

In a report of a visit to Dr. Roland on November 25, 2003 it was noted that the plaintiff seemed more comfortable "with fairly good affect" through occasional use of a TENS unit, in addition to Loritab and a Lidoderm patch used approximately every other night to help her sleep. AT 323.  Dr. Roland wrote in a memorandum regarding a subsequent visit on January 14, 2004 that plaintiff had to "learn to live with her pain" with a combination of Loritab, Lidoderm patches, and a TENS unit and that she did well during a recent hysterectomy.[10]  AT 322.  Dr. Roland added, however, that he supported plaintiff's efforts to secure disability benefits, adding that under "no circumstances [should she] ever do any heavy lifting".  *Id.*

On January 20, 2004, Dr. Roland completed a medical report regarding plaintiff's physical condition for use in connection with her application for SSI benefits.  AT 343-47, repeated at AT 351-55.  In that report Dr. Roland indicated that due to her chronic back pain, the plaintiff can only lift and carry ten pounds occasionally and can only sit, stand, or

---

[10]     Plaintiff was scheduled for a hysterectomy at that time due to dyspareunia and painful menstrual cycles.  AT 323.  Dyspareunia is difficult or painful sexual intercourse.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 586 (31st ed. 2007).

walk for up to two hours at a time, noting that even then she would need continuous breaks.  At  344-45.  The doctor also noted that plaintiff should never push, pull, stoop, crouch, or crawl, but that she can climb, balance, or kneel occasionally; reach, handle, and feel frequently; and hear and speak continuously.  AT 346.  The plaintiff was further restricted by Dr. Roland from operating machinery due to the fact it could cause strain on her hernia repair.  AT 347.

In May of 2004, the plaintiff again saw Dr. Roland, reporting a worsening of her right flank pain.  AT 358.  During that visit plaintiff stated that there had recently been days when "she simply [could not] move because of the right flank pain."  *Id.*  According to Dr. Roland's notes of that visit, the plaintiff could not identify a traumatic event as a source of her pain, though she acknowledged having moved some furniture at about the time of the onset of the pain.  *Id.*

Plaintiff was next seen by a doctor in Dr. Roland's office in September 2005, complaining of continuous diarrhea.  AT 399.  During a subsequent visit with Dr. Roland in October of 2005, the plaintiff reiterated her complaint of diarrhea and requested more pain medication.  AT 395. Dr. Roland later discussed with the plaintiff the issues of narcotic

dependence and abuse during an appointment in early January, 2006.  AT 394.

On January 19, 2006, the plaintiff underwent a colonopscopy to determine the cause of her recurrent diarrhea.  AT 390-91.  Although the colonopscopy results were normal, her biopsy revealed the presence of collagenous colitis.  AT 376, 391.

While plaintiff's chronic pain symptoms continued to be followed by Dr. Roland, plaintiff was also under the care of other professionals, including Dr. Steven Heintz at the Tupper Lake Health Center, from July 27, 2004 until at least January 27, 2006, for treatment of chest pain, anxiety, gastroesophageal reflux disease ("GERD"), hemorrhoids, an ingrown toenail, and requests for pain medication refills.[11]  AT 360-74.

In addition to her treating sources, plaintiff has been seen by various medical consultants.  Plaintiff underwent a psychiatric evaluation by David J. Meeker, Ph.D. on March 27, 2003.  AT 295-98.  In his evaluation report Dr. Meeker stated that the plaintiff did not appear to have significant limitations in the areas of personal, social, and vocational adjustment, but

_____

[11]  During a February 6, 2006 visit Dr. Roland expressed to plaintiff his concern that she not obtain narcotics from multiple sources, to which she responded that she would only seek prescription pain relief medication from Dr. Roland and Dr. Heintz.  AT 389.

that her intellectual functioning was borderline with a verbal intelligence quotient (I.Q.) of 75, a performance I.Q. of 74, and a full scale I.Q. of 72. AT 297-98.  The report also indicated that plaintiff's scores on arithmetic subtests of the WAIS suggest potential problems with her ability to manage funds.  AT 298.  Dr. Meeker did not diagnose the plaintiff as suffering from any other mental condition or recommend any mental health treatment, and indicated that her prognosis "seems good".  AT 297-98.

On May 8, 2003, the plaintiff was seen by Dr. Barry J. Kilbourne for the purpose of undergoing a consultative physical examination.  AT 299-300, 369. In his notes of that examination Dr. Kilbourne observed that although the plaintiff has a very large scar and "an obvious defect under the skin" in the area of the right-hand side of her abdomen, the scar does not cause any major pain.  AT 299.  He also noted, however, that although there is no obvious evisceration or defect, the area of the scar is "tender and abnormal."  *Id*.  Dr. Kilbourne wrote in his report that the plaintiff did not appear capable of returning to work in the immediate future; that opinion is seemingly based, at least in part, on what the plaintiff told him regarding Dr. Roland's opinion.  AT 300.  Dr. Kilbourne stated that

because he is not the plaintiff's treating surgeon, he believed further confirmation of Dr. Roland's assessment would be helpful; he also noted his doubt, based on the plaintiff's chronic pain and the fact that motion causes her discomfort, that she can sustain any gainful employment.  AT 300.

In June of 2003, the plaintiff's medical history was reviewed by both a state agency physician, Dr. Alan Auerbach, and a state agency psychologist, Lisa Newman, Ph.D.  AT 301-20.  Based upon his review, Dr. Auerbach noted that the plaintiff was healing without complications and opined that she should be capable of performing sedentary work within twelve months of her surgery.  AT 301.   After conducting her review, Dr. Newman completed a mental RFC assessment form dated June 11, 2003, in which she noted that plaintiff experiences marked limitations in her ability to understand, remember and carry out detailed instructions, and the fact that she has never undergone any psychiatric treatment, but concluded that the plaintiff has no other significant limitations in mental functioning.  AT 317-19.

Following his review of the record, the ALJ prepared and presented interrogatories to Dr. Aaron Satloff, a medical expert.  AT 411-14.  Dr.

Satloff responded by acknowledging plaintiff's borderline intellectual functioning and apparent cannabis and cocaine abuse history, which draw support from plaintiff's medical records, but indicated that the plaintiff's impairments are not sufficiently severe to meet any of the presumptively disabling conditions listed in the agency's regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1. ("Listings").  AT 411.  Dr. Satloff also prepared a medical source statement regarding plaintiff's mental abilities to perform work-related functions.  AT 415-17.  In that report, Dr. Satloff indicated that the plaintiff has some difficulties understanding, remembering, and carrying out detailed instructions, and that her abilities to make judgments on simple work-related decisions and to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting are slightly impaired.  AT 415-16.  The consultant also noted that the plaintiff cannot not manage benefits in her own best interest.  AT 417.

Interrogatories were also posed to Dr. Jose Rabelo, a medical expert, concerning plaintiff's physical condition.  AT 428-35.  Dr.  Rabelo answered those interrogatories based on the plaintiff's physical medical history, similarly concluding that none of the plaintiff's impairments, including post hernia repair pain, ankle pain, and persistent diarrhea, were

sufficiently severe either singly or in combination to meet or medically equal the conditions described by the relevant Listings.  AT 428.  Dr. Rabelo also wrote that the plaintiff can lift twenty pounds occasionally and ten pounds frequently, and can stand and/or walk for six hours in an eight hour workday, with normal breaks.[12]  AT 432.  Dr. Rabelo indicated that plaintiff can frequently climb, balance, and kneel, as well as occasionally crouch, crawl, and stoop, and that she is in no other way restricted.  AT 433-35.

On October 6, 2006, Dr. Heintz, one of plaintiff's treating physicians, also provided a report of the plaintiff's medical condition.  AT 478-93.  In that report Dr. Heintz wrote that the plaintiff is unable to lift or carry any weight; cannot sit, stand, or walk for more than a total of two hours in an eight hour workday; and can only sit, stand, or walk for fifteen minutes at any one time without stopping due to her pain.  *Id.*  He further noted that the plaintiff can never use her right foot, climb, balance, stoop, crouch,

---

[12]     Dr. Rabelo's response to the inquiry regarding standing and/or walking is somewhat equivocal.  In his initial answer to that inquiry the doctor indicated that plaintiff's ability to stand and/or walk is not affected by her impairments.  AT 432.  Despite being asked to further refine the answer only in the event of a "yes" response to that question, Dr. Rabelo nonetheless checked the box indicating that plaintiff is able to stand and/or walk for about six hours in an eight hour workday.

kneel or crawl, and that while she can occasionally reach, she cannot

push, pull or be exposed to heights, moving machinery, or vibrations.  AT

481-83.  These observations came on the heels of plaintiff's August 3,

2006 visit with Dr. Heintz, during which he diagnosed her as suffering from

lumbar back pain and plantar fasciitis, and prescribed Oxycontin for her

pain.  AT 437.

II.   PROCEDURAL HISTORY

    A.   Proceedings Before The Agency

Plaintiff filed an application for SSI benefits on February 10, 2003,

alleging a disability onset date of January 6, 2003.  AT 19, 103-08.

Following the denial of that application, AT 25-29, a hearing was held on

November 4, 2004 by ALJ Carl Stephan to address plaintiff's claim for

benefits.  AT 50-56, 488-510.  In a decision dated January 12, 2005, ALJ

Stephan upheld the agency's decision denying the plaintiff's application

for benefits.  AT 63-70.  That determination, however, was vacated on

appeal to the Social Security Administration Appeals Council ("Appeals

Council"), and the matter was remanded for further administrative

proceedings.  AT 74-76.  In its decision the Appeals Council noted that

although the ALJ found that an aspect of Dr. Roland's assessment was

inconsistent with the evidence of the record, the ALJ failed to contact Dr. Roland to resolve the inconsistencies or, alternatively, to provide sufficient rationale for rejecting them.  AT 75-76.

Following remand, on September 19, 2006, ALJ  Stephan held a second hearing, at which time the plaintiff and Esperanza DiStefano, a vocational expert, gave testimony.  AT 90-93, 511-33.  After the conclusion of the hearing ALJ Stephan issued a second decision, on November 14, 2006, again denying plaintiff's claim.  AT 14-20.  In his decision ALJ Stephan applied the now familiar five step test for determining disability, finding first that plaintiff did not engage in substantial gainful activity at any time relevant to the decision.  AT 14.  At step two, ALJ Stephan concluded that the plaintiff suffers from severe urological, musculoskeletal, and mental impairments, but that they are not, either individually or in combination, sufficiently severe to meet or equal any of the Listings of presumptively disabling impairments.  AT 14, 17, 19.

ALJ Stephan next surveyed the available medical evidence and hearing testimony and concluded that despite her conditions plaintiff retains the residual functional capacity ("RFC") to perform sedentary work activity which takes into account occasional problems understanding and

executing detailed instructions, dealing with work stresses, responding to changes in work setting, and her need to be close to a bathroom, given that her gastrointestinal problems require that she use such facilities at least five times per day.[13]  AT 17.  To support his RFC finding ALJ Stephan relied in part on the March 2003 consultative examination of the plaintiff by Dr. Meeker, reflecting the plaintiff's ability to follow and carry out directions well, though noting the finding that she is of borderline intellectual functioning.  AT 17.  The ALJ also relied upon opinions of Dr. Satloff indicating only minimal limitations in understanding, remembering, and carrying out detailed instructions as set forth in the treating notes of Dr. Roland and the opinions of Dr. Rabelo regarding plaintiff's physical limitations.  When determining plaintiff's RFC, ALJ Stephan also

---

[13]     Sedentary work is defined by regulation as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  In addition, a subsequent ruling has clarified that sedentary work generally involves periods of standing or walking for a total of two hours in an eight hour workday, with sitting up to a total of approximately six hours in a similar period.  See Social Security Ruling 83-10.

considered but rejected plaintiff's subjective complaints of disabling pain as not fully supported by the medical record.  AT 16-17.

ALJ Stephan explained that in determining plaintiff's workplace capacities he reviewed the record as a whole and determined not to give controlling weight to the report of Dr. Roland, plaintiff's treating physician, and particularly his findings regarding the plaintiff's ability to sit, stand, and walk, since those findings are not supported by the medical evidence.  AT 17-18.  In rejecting that opinion the ALJ relied upon Dr. Rabelo's findings of January of 2004 that plaintiff can sit without limitation, can stand and walk for up to six hours per day, and can occasionally lift twenty pounds and ten pounds frequently. AT 17-18.  ALJ Stephan also noted that "[plaintiff] reported to Dr. Roland in January 2004 that she had learned to live with her symptoms [but that she] exacerbated her symptoms while moving furniture, an activity which exceeds the demands of sedentary work and the restrictions imposed by Dr. Roland."  AT 17.

ALJ Stephan similarly opted not to give controlling weight to the reports of Dr. Heintz, the plaintiff's family practitioner, finding that the restrictions identified by that doctor were grossly at odds with the diagnostic studies of record and the reports of other physicians

participating in the claimant's health care, especially concerning the

plaintiff's ability to lift.   AT 18.  In his report, Dr. Heintz opined that the

plaintiff could not perform any lifting activities, and she could only sit,

stand, and walk for less than fifteen minutes at a time.  AT 18.   In

ultimately rejecting the opinions of Dr. Roland and Dr. Heintz, ALJ

Stephan presumably based his decision on the reports of Dr. Rabelo and

Dr. Meeker.  AT 14-19.

After noting that plaintiff has no past relevant work experience of

significance to be considered at step four, and acknowledging the shifting

of burdens to the Commissioner to show the lack of jobs in sufficient

numbers in the national economy which the plaintiff is capable of

performing consistent with her discernable impairments, and referencing

the medical vocational guidelines (the "grid") set forth in the governing

regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, for use as a framework,

the ALJ relied upon testimony elicited from a vocational expert during the

hearing to assist with his step five determination.  AT 18-19.  In response

to a series of hypothetical questions, the vocational expert gave various

opinions as to the existence of jobs capable of being formed by the

plaintiff.  AT 525-30.  The vocational expert testified that despite her

limitations, plaintiff should be able to perform the full range of duties associated with the jobs of information clerk, telephone solicitor, and order clerk, and that jobs in those three categories exist in sufficient numbers in the national and local economies.  AT 527-529.  When asked to assume the additional limitation of frequent problems with understanding, remembering and carrying out detailed instructions, dealing with work stresses and responding to changes in the work setting, however, the vocational expert testified that plaintiff would only be able to perform the job of new accounts clerk, a position which also exists in sufficient numbers in the national and local economies.  AT 529-30.  Based upon the testimony of the vocational expert, confirming the result obtained through use of the grid as a framework, the ALJ concluded that plaintiff was not disabled at the relevant times and thus was ineligible to receive SSI benefits.  AT 19-20.

ALJ Stephan's decision became a final determination of the agency on January 16, 2009, the date upon which the Appeals Council denied plaintiff's request for review of that opinion.  AT 6-8.

B.    This Action

Having exhausted her administrative remedies, plaintiff commenced

this action on February 6, 2009.  Dkt. No. 1.  Issue was thereafter joined

on August 4, 2009 by the Commissioner's filing of an answer, Dkt. No. 9,

preceded by submission of an administrative transcript of the evidence

and proceedings before the agency.  Dkt. No. 7.  With the filing of

plaintiff's brief on November 2, 2009, Dkt. No. 12, and that on behalf of

the Commissioner on December 16, 2009, Dkt. No. 13, the matter is now

ripe for determination, and has been referred to me for the issuance of a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(d).  *See also* FED. R. CIV. P.

72(b).[14]

III.    DISCUSSION

        A.      Scope of Review

        A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

_____

        [13]     This matter has been treated in accordance with the procedures set
forth in General Order No. 18 (formerly, General Order No. 43) which was issued
by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on
January 28, 1998, and subsequently amended and reissued by Chief District
Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order
an action such as this is considered procedurally, once issue has been joined, as if
cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c)
of the Federal Rules of Civil Procedure.

22

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F.Supp.2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the ALJ has applied the correct legal standards and substantial evidence supports the ALJ's findings, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F.Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420,

1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197,

229, 59 S.Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184

(2d Cir. 2003).  To be substantial, there must be "'more than a mere

scintilla'" of evidence scattered throughout the administrative record.

*Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated

Edison Co.*, 305 U.S. at 229, 59 S.Ct. at 217); *Martone*, 70 F.Supp.2d at

148 (quoting *Richardson* ).  "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court

considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also

include that which detracts from its weight."  *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456,

464 (1951)).

　　　　When a reviewing court concludes that an ALJ has applied incorrect

legal standards, and/or that substantial evidence does not support the

agency's determination, the agency's decision should be reversed.  42

U.S.C. § 405(g); *see Martone*, 70 F.Supp.2d at 148.  In such a case, the

court may remand the matter to the Commissioner under sentence four of

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to

develop a full and fair record or to explain his or her reasoning.  *Martone*,

70 F.Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and*

*Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand,

while unusual, is appropriate when there is "persuasive proof of disability"

in the record and it would serve no useful purpose to remand the matter

for further proceedings before the agency.  *Parker*, 626 F.2d at 235;

*Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.1992);

*Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir.

1983).

　　　B.　　Disability Determination-The Five Step Evaluation Process

　　　The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months . . . ."  42 U.S.C. §

423(d)(1)(A).  In addition, the Act requires that a claimant's

physical or mental impairment or impairments [must be] of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively

disabled." *Martone*, 70 F.Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Perez*, 77 F.3d at 46. In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills. *Ferraris*, 728 F.2d at 585; *Martone*, 70 F.Supp.2d at 150.

      C.    <u>The Evidence In This Case</u>

          1.    <u>Treating Physician</u>

In support of her challenge to the Commissioner's determination, plaintiff first argues that the ALJ erred in his failure to assign controlling weight to the opinions of Dr. Roland and Dr. Heintz, to the effect that during all relevant periods she has been disabled.

Ordinarily, the opinion of a treating physician regarding the nature and severity of an impairment is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588; *Barnett*, 13 F.Supp.2d at 316.[15]  Such opinions are not controlling, however, if they are contrary to other substantial evidence in the record, including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28,

---

[15]    The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions from your treating sources . . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where conflicts arise in the form of contradictory medical evidence, their resolution is properly entrusted to the Commissioner.  *Veino*, 312 F.3d at 588.

When a treating physician's opinions are not given controlling weight, "the regulations require that the ALJ consider several factors in determining how much weight it should receive."  *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *see also* 20 C.F.R. § 404.1527(d)(2); *Schaal v. Apfel*, 134 F.3d 496, 505 (vacating an adverse judgment on a disability benefits claim, and remanding for further proceedings, where the ALJ failed to provide plaintiff with "good reasons" for the lack of weight attributed to her physician's opinion, and therefore the court was unsure what legal standard the ALJ applied in  weighing the treating physician's opinion).  Those factors include 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the degree to which the medical source supported his or her opinion; 4) the degree of consistency between the opinion and the record as a whole; 5) whether the opinion is given by a specialist; and 6) other evidence which may be brought to the attention of the ALJ.  *See* 20 C.F.R. §§ 404.1527, 416.927.  One of the more preeminent factors among the

six listed above is the fact that "[g]enerally, the longer a treating source

has treated [the claimant] and the more times [the claimant] ha[s] been

seen by a treating source, the more weight [the Commissioner] will

give to the source's medical opinion".  20 C.F.R. § 404.1527(d)(2)(i).

When a treating physician's opinions are repudiated, the ALJ must

provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  The failure to apply the appropriate legal standards for

considering a treating physician's opinions constitutes a proper basis

for reversal of the disability determination.  *See Johnson*, 817 F.2d at

986; *Barnett*, 13 F.Supp.2d at 316-17.

To support her claim of disability, the plaintiff heavily relies on

the opinions of Dr. Roland, who treated her for her physical conditions

over an extended period.  She argues that Dr. Roland was both well

qualified and knowledgeable regarding the treatment of a flank hernia

and the pain that can be caused by stitches to the erector spinae

muscle.  Additionally, plaintiff notes Dr. Roland performed her hernia

repair and saw her for over twenty post-surgical visits, each time

assessing her pain and tracking the recovery of her hernia repair.  *See*

AT 322-38.  Dr. Roland opined on multiple occasions that the plaintiff

is disabled due to her hernia repair, risk of recurrence, and chronic

pain, and has also suggested relevant physical restrictions in her

ability to perform work-related activities, including in a report

completed in January of 2004.  AT 322, 333, 343-47.  It therefore

appears that plaintiff's medical records do contain evidence of an

opinion by Dr. Roland with respect to her ability to perform work-

related activities and of her level of functionality.

  "The opinion of a treating physician is not entitled to controlling

weight where the opinion is not a functional analysis."  *Gray v. Astrue*,

No. 1:06-cv-0456, 2009 WL 790942, at *8 (N.D.N.Y. Mar. 20, 2009)

(Mordue, C.J. & Homer, M.J.) (citing *George v. Bowen*, 692 F.Supp.

215, 219 (S.D.N.Y. 1988) (concluding that treating physician's report

was not entitled to controlling weight as it contained no assessment of

plaintiff's ability to lift and carry weight); *Hopper v. Comm'r of Social

Sec.*, No. 7:06-cv-0038, 2008 WL 724228, at *9 (N.D.N.Y. Mar. 17,

2008) (Kahn, J. & Homer, M. J.) (holding that the treating physician

never provided any opinions regarding the plaintiff's ability to do work-

related activities nor his level of disability, thus the ALJ did not err in

failing to discuss what weight should be given to the treating

physician's findings as none of those findings described the plaintiff's

limitations).  This is not such a case, however; instead, the record

reveals that Dr. Roland has provided an assessment of the plaintiff's ability to lift and carry weight and how that assessment relates to her ability to do work-related activities, thus providing an appropriate functional analysis of her alleged disability and its effects.

In its determination vacating the earlier decision and remanding the matter to ALJ Stephan, the Appeal's Council discerned the lack of a proper basis for rejecting Dr. Roland's assessment regarding plaintiff's ability to sit, stand, and walk, a rejection which is pivotal to the ALJ's finding of no disability, and observed that "[ALJ Stephan] did not recontact Dr. Roland to resolve the inconsistencies in this case or provide sufficient rationale for rejecting [Dr. Roland's assessment] prior to issuing the decision" and pointedly directed that upon remand he was to "[g]ive further consideration to Dr. Roland's assessment. . . and explain the weight given to such opinion evidence."  AT 75-76. Although the remand order gave the ALJ the option of either re-contacting Dr. Roland, with the aid of plaintiff's counsel, to resolve any perceived inconsistencies, or to provide a sufficient rationale for rejecting his conclusions, it seems clear from the decision that the preferred option was for the ALJ to obtain additional information from plaintiff's treating physician.

32

Despite this, there is no indication in the record that ALJ Stephan made any efforts to elicit further information from Dr. Roland. Instead, the ALJ sought opinions from a non-examining source, Dr. Rabelo, who was provided with undisclosed medical records of the plaintiff, and then relied upon the opinions of that non-examining source, in combination with alleged objective clinical findings and plaintiff's own stated activities, to reject those opinions of Dr. Roland.

As a non-examining physician, Dr. Rabelo's opinions are entitled to little weight. *Rodriguez v. Barnhart*, 249 F.Supp. 210, 213 (E.D.N.Y. 2003). For the ALJ to elevate the opinions of that non-examining physician over those of plaintiff's longstanding health care provider, Dr. Roland, under the circumstances now presented constituted error.

The ALJ's error in this regard was compounded by his failure to indicate his view as to the weight that should be accorded Dr. Roland's January 2, 2004 medical assessment opinions. The error was further aggravated by the ALJ's rejection of restrictions identified in the October, 2006, report of Dr. Heintz, another of plaintiff's treating physicians, as "grossly at odds with the diagnostic studies of record", and abrupt conclusion that the report therefore is not entitled to controlling weight. *See* AT 18.

In this instance, the ALJ's failure to fully apply the strictures of the treating physician rule compels a remand for further proceedings. *See Johnson*, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."). The ALJ erred in not giving controlling weight to the opinions of Dr. Roland and Dr. Heintz in view of the length of frequency of their examinations, the extensive nature of their treatment relationships with the plaintiff, and their opinions' consistency with the record as a whole. Additionally, while Dr. Heintz is a family practitioner Dr. Roland is a specialist whose opinions were entitled to enhanced deference, another factor that the ALJ should have taken into consideration. *Halloran*, 362 F.3d at 32.

The only physician whose opinion is "grossly at odds" with the opinions of plaintiff's treating physicians is a non-examining physician, Dr. Rabelo.[16]   Accordingly, there exists a reasonable basis for doubt

---

[16]     Nowhere in his opinion does ALJ Stephan explain why the opinions of Dr. Kilbourne, a consultant who conducted a physical examination of the plaintiff

whether the "good reasons" required by C.F.R. § 404.1527(d)(2) for lack of weight attributed to a medical opinion were provided in the ALJ's decision.  *See Minsky v. Apfel,* 65 F.Supp.2d 124, 136-37 (E.D.N.Y. 1999) (remanding plaintiff's denial of SSI benefits where all of the plaintiff's treating doctors either expressly stated that plaintiff was disabled or implicitly found so by concluding that she lacked residual functional capacity for sedentary work); *see also Morillo v. Apfel*, 150 F.Supp.2d 540,547 (S.D.N.Y. 2001) ("ALJ's failure…to fully apply the strictures of the treating physician rule compels a remand.").

Both of plaintiff's treating sources, Dr. Roland and Dr. Heintz, are unanimous in their opinions that due to her physical impairments plaintiff is unable to sit, stand, or walk for more than two hours in an eight hour workday.  AT 343-47, 480-83.  While Dr. Roland's opinion regarding plaintiff's lifting capacity is consistent the ALJ's RFC determination, Dr. Heintz has given his opinion that plaintiff is incapable of lifting at any level, and cannot climb, balance, stoop, crouch, kneel, fall, push or pull, and should only occasionally be

_____

on May of 2003 and found her incapable of returning to work, *see* AT 299-300, were not considered when deciding to accept the contrary opinions of Dr. Rabelo, a non-examining consultant.

required to reach.  AT 480-83.  The ALJ's rejection of these opinions

does not reflect the deference owed to these opinions, as those of

treating sources, nor does the rejection of those opinions find the

support of substantial evidence in the record.

### 2.    Plaintiff's Credibility

During the course of first and second hearings, plaintiff testified

concerning the pain that she experiences and the effects it has had on

her ability to perform work related functions.  At the first hearing, for

example, plaintiff testified that in light of her pain she is unable to sit

for more than fifteen minutes without changing positions due to

"excruciating pain" in the small of her back near her incision, and that

she can walk only for about six minutes before resting.  AT 503.  In the

second hearing session plaintiff similarly addressed the pain from

which she suffers, noting that she cannot lift more than a gallon of milk

without experiencing pain.  AT 519.  In his decision, ALJ Stephan

rejected plaintiff's subjective complaints of disabling pain as not

credible, concluding that while "the claimant may occasionally

experience some discomfort [the ALJ] finds no evidence that it is of

such frequency, intensity or duration as so render her incapable of

performing substantial gainful activity on a sustained basis."  AT 16-17.

In support of her request for reversal of the agency's determination, plaintiff challenges this finding.

It is well within the discretion of the Commissioner to evaluate the credibility of a plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence.  *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements (S.S.A. 1996).  "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," all information submitted by a claimant concerning his or her symptoms must be considered.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The claimant's testimony alone carries independent weight; to require a claimant to fully substantiate his or her symptoms with "medical evidence would be both in abrogation of the regulations and against their stated purpose." *Matejka v. Barnhart*, 386 F.Supp.2d 198, 207 (W.D.N.Y. 2005) (citing *Castillo v. Apfel*, No. 98 CIV. 0792, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

"Evidence of pain is an important element in the adjudication of

[disability benefits] and SSI claims, and must be thoroughly considered in calculating the RFC of the claimant." *Meadors v. Astrue,* No. 09-3545-CV, 2010 WL 1048824, at *3 (2d Cir. Mar. 23, 2010) (summary order) (cited in accordance with Fed. R. App. Pr. 32.1) (citing *Lewis V. Apfel*, 62 F.2d 648, 657 (N.D.N.Y. 1999).  The regulations prescribe a specific process that the ALJ is to follow in weighing a claimant's testimony concerning pain.  The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b).  If the ALJ finds such impairment, then the ALJ next evaluates the intensity and persistence of the symptoms to determine how the symptoms limit the claimant's functioning.  20 C.F.R. §§ 404.1529(c), 416.929(c).

A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms.  *Barnett*, 13 F. Supp. at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations, then the

ALJ must consider additional factors, including: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of any symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to relieve symptoms; 5) other treatment received; and 6) any other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  *Martone*, 70 F.Supp.2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Although the ALJ is free to accept or reject such testimony, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams*, 859 F.2d at 260-61 (citation omitted). Where substantial evidence supports the ALJ's findings, the decision to discount subjective testimony may not be disturbed on court review. 42 U.S.C. § 405(g); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

The credibility analysis engaged in by ALJ Stephan is

significantly uninformative.  The ALJ does not, for example, indicate whether plaintiff suffers from a medically determinable impairment that could reasonably be expected to produce her claimed symptoms, instead noting excerpts in the medical records suggesting that they have been controlled through the use of many pain treatment regimens, including use of narcotics and a TENS unit.  AT 16.  The ALJ also relies upon the opinions of non-examining physician Dr. Rabelo, opinions which I have already noted are not entitled to particularly strong weight.

A fact which apparently has taken on great significance for the ALJ is plaintiff's statement to Dr. Roland indicating that at some  point she was engaged in moving furniture.  AT 16.  No additional information is provided in the record with regard to this incident, and the statement thus lacks the context necessary to fairly evaluate its significance in the credibility calculus.  Moreover, what was not considered by the ALJ was the extent of plaintiff's daily activities, the various medications she takes for relief, and other measures she utilizes to address her pain.  The record establishes that plaintiff's subjective complaints of pain could reasonably be expected to be caused by her diagnosed medical conditions.  Given these

circumstances, the ALJ's rejection of plaintiff's testimony in this regard solely on the basis of an apparently isolated incident of moving furniture, without any factual detail, and the report of a non-treating consultant who did not examine the plaintiff does not comport with the applicable regulations, thus warranting reversal of the ALJ's determination.  *Meadors*, 2010 WL 1048824, at *4 (citing *Barringer v. Comm. of Soc. Sec.*, 358 F.Supp.2d 67, 81 n.25 (N.D.N.Y. 2005)) (other citation omitted).

Beyond this evident flaw in the ALJ's reasoning, there is ample evidence in the record to suggest that the plaintiff's hernia repair site has caused her severe ongoing pain, impairing her ability to perform substantial gainful activity on a sustained basis.   Plaintiff developed chronic pain syndrome following her hernia repair, and Dr. Roland observed that plaintiff had "persistent pain at the posterior aspect of her hernia repair" over four months after the procedure.  AT 328.  In minimizing the effects of pain experienced by the plaintiff, the ALJ focuses on the fact that in November 2003 "Dr. Roland indicated that the claimant's pain was under fair control. . . [and] that she had learned to live with her symptoms."  AT 17.  The ALJ does not seem to have adequately considered the fact that in order to achieve "fair

control" of her symptoms she was using a Lidoderm patch[17], taking

Lortab, and using a TENS unit for pain and that she was still tender

along her right side.[18]  AT 323. 322.  Moreover, the ALJ does not

mention other medication the plaintiff has taken from the alleged onset

date forward to help her cope with the pain, anxiety, kidney condition

and difficulty sleeping, including Vicodin[19], Percocet[20], OxyContin[21],

---

[17]    Lidoderm is a trademark for preparation of lidocaine which is a drug having anesthetic, sedative, analgesic, anticonvulsant, and cardiac depressant activities, used as a local anesthetic, applied topically to the skin and mucous membranes.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1048 (31st ed. 2007).

[18]    I note that although the ALJ deems the plaintiff's testimony relating to pain and discomfort as incredible, he does seem to rely on certain portions of the testimony in reaching his decision.  For example, in her September 19, 2006 testimony the plaintiff described the symptoms she was experiencing as a result of her collagenitis colitis.  AT 516-23.  Plaintiff explained that on a good day she would have ten bowel movements, none of which were a normal stool.  AT 517.  The ALJ apparently used this testimony in his determination that plaintiff has "the need for proximity to a bathroom, given the claimant's need to use the bathroom at least five times per day due to gastrointestinal complaints".  AT 16.

[19]    Vicodin is a trademark for combination preparations of hydrocodone bitartrate (the salt of hydrocodone, used as an analgesic and antitussive; administered orally) and acetaminophen.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 890, 2084 (31st ed. 2007).

[20]    Percocet is a trademark for combination preparation of oxycodone hydrochloride (salt of an opioid agonist analgesic derived from morphine) and acetaminophen.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1377, 1429 (31st ed. 2007).

[21]    OxyContin is trademark for a preparation of oxycodone hydrochloride.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1377 (31st ed. 2007).

Depo-Medrol[22], Levaquin[23], Neurontin[24], Ambien[25],  Nexium[26] and

Trazodone[27].  AT 324, 333, 336, 365-68, 371, 380, 437, 441.  *See*

*Correale-Englehart v. Astrue*, __ F.Supp.2d __, 2010 WL 446175

(S.D.N.Y.  Feb. 8, 2010) ("The fact that plaintiff was taking such pain

medication over [the three year period] is, if anything, another

indication that she was experiencing serious pain since the [alleged

onset date].").

------

[22]    Depo-Medrol is trademark for preparations of methylprednisolone acetate (muscular injection preparation for synthetic glucocorticoid derived from progesterone, used as an anti inflammatory).  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 499, 1171 (31st ed. 2007).

[23]    Levaquin is trademark for preparations of levofloxacin (an antibacterial agent used in the treatment of skin and soft tissue infections. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1045-46 (31st ed. 2007).

[24]    Neurontin is a trademark for preparations of gabapentin which is an anticonvulsant that is a structural analogue of GABA, used as adjunctive therapy in the treatment of partial seizures; administered orally.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 764, 1287 (31st ed. 2007).

[25]    Ambien is a trademark for a preparation of zolpidem tartrate which is a non-benzodiazepine sedative-hypotic administered orally in the short-term treatment of insomnia.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 58, 2120 (31st ed. 2007).

[26]    Nexium is trademark for a preparation of esomeprazole magnesium (a proton pump inhibitor used as a gastric acid secretion inhibitor in the treatment of symptomatic gastroesophageal reflux disease).  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 654,1293 (31st ed. 2007).

[27]    Trazodone is an antidepressant used to treat major depressive episodes with or without prominent anxiety; administered orally.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1983 (31st ed. 2007).

Additionally, it should be noted that in assessing plaintiff's credibility, the ALJ also does not meaningfully evaluate her ability to perform daily activities.  In that regard, plaintiff testified that her activities are extremely limited, and she cannot carry laundry, vacuum, or perform many other household functions.  AT 499-502.  While plaintiff engages in hobbies, they are confined to those that she can perform while sitting or standing, with the ability to change positions.  AT 506-08.  Plaintiff's testimony revealed that her daily activities were still inhibited by her repair site, over three years after the surgery, and that she is almost completely dependent on her children and niece for simple tasks such as help with grocery shopping, dishes, laundry, and getting a cup of coffee.  AT 499, 508, 519.  While the ALJ does mention some of plaintiff's testimony regarding her restricted abilities in his decision, other relevant portions of plaintiff's testimony appear to have been completely overlooked.  For example, the ALJ does not cite plaintiff's testimony to the effect that she has serious difficulty sleeping because of the pain, and as a result, wakes up several times during the night.  AT 497.  The record also reveals that plaintiff has tried heating pads, switching to a water bed, and has taken Ambien to aid her sleep pattern.  AT 497, 503.  ALJ Stephan also fails to cite

plaintiff's testimony describing her need to push on the surgical mesh when she coughs or bends over, thus preventing the staples from ripping from the hernia repair site.  AT 496-97.  Nor does he refer to plaintiff's testimony explaining how it takes her several minutes to bend over to pick something up once it has fallen, or that the only way for her to get out of bed is to "roll onto the floor onto [her] hands and knees",  AT 501-02, once again demonstrating that the ALJ did not take into account all the pertinent evidence in the record.  *See Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (W.D.N.Y. 2002) ("The ALJ cannot pick and choose only that portion of the evidence that supports his conclusions.") (citation omitted).

Factors leading me to conclude that the matter must be remanded include the lack of information in the record regarding the furniture moving incident and that, notwithstanding that the ALJ finds certain portions of plaintiff's testimony credible, he rejects her testimony regarding the pain she suffers even though there exists significant evidence in the record indicating that plaintiff does experience chronic pain on a daily basis.  In view of these facts, I find that the explanation given by the ALJ for rejecting plaintiff's claims of disability symptomology is significantly inadequate and fails to satisfy

45

the applicable requirements of C.F.R. § 404.1529(c).  *See Correale-Englehart,* 2010 WL 446175, at *36 (remanding case where the ALJ failed to mention, *inter alia*, some of the medication plaintiff had taken and how they affected her overall functioning and therefore did not take all the pertinent evidence in the record into consideration); *Amrod v. Commiss. of Social Sec.*, No. 5:08-cv-464, 2010 WL 55934 at *16-*17 (N.D.N.Y. 2010) (Hurd, J. & Peebles, M.J.) (remanding case where the ALJ did not adequately explain his reasoning for rejecting plaintiff's claims of disability sympomology because he failed to address, *inter alia*, certain parts of plaintiff's testimony, and the precipitating and aggravating factors leading to his symptomology); *Morseman v. Astrue*, 571 F.Supp.2d 390, 396-97 (W.D.N.Y. 2008) (remanding case where ALJ relied on his own lay opinion in finding plaintiff's subjective complaints of pain not to be entirely credible).

### 3.   Vocational Expert's Testimony

Plaintiff's final argument surrounds the ALJ's step five determination.  Plaintiff maintains that the Commissioner failed to carry his burden at step five to establish the existence of available work capable of being performed by the plaintiff, given her limitations, and that when her relevant characteristics are applied to the grid a finding

of disability is warranted.

Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grid. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  The grid takes into consideration a claimant's RFC, as well as his or her age, education, and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy.  *Rosa*, 168 F.3d at 78.  Whether or not the grid should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved.  *Bapp*, 802 F.2d at 605.  If a plaintiff's situation fits well within a particular classification, then resort to the grid is appropriate.  *Id.*  If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grid is inappropriate, in which case further evidence and/or testimony is required.[28] *Rosa*,

---

26      As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain.

47

168 F.3d at 78; *Bapp*, 802 F.2d at 605-06.

While the ALJ in this case referenced the grid as a framework, he also acknowledged the reality that because of plaintiff's additional non-exertional limitations it could not be relied on to determine the question of disability and, accordingly, sought vocational expert testimony to fill that void.  It is well established that eliciting testimony from a vocational expert is a proper means of fulfilling the agency's burden at step five of the disability test to establish the existence of jobs in sufficient numbers in the national and regional economy that plaintiff is capable of performing.  *Bapp*, 802 F.2d at 604-05; *Dumas v. Schweiker*, 712 F.2d 1545, 1553 -54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp. 2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566, 416.966.  Use of hypothetical questions to develop the vocational expert's testimony is also permitted, provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ.  *Varley*

_____

*Sobolewski v. Apfel*, 985 F.Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569(a), (c)).

*v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). If the factors set forth in the hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability.  *Id.*

The ALJ elicited testimony from a vocational expert, Esperanza DiStefano, at the September 19, 2006 hearing regarding what, if any, jobs were available in the national economy that plaintiff could perform. AT 523-531.  ALJ Stephan posed multiple hypothetical questions to the vocational expert, focusing on plaintiff's age, education, work experience, and RFC.  20 C.F.R. § 404.1520(f).  Upon considering the ALJ's second hypothetical, involving an individual in her late-30s or early-40s with a ninth grade education and the same past work experience as the plaintiff, which is limited to sedentary work with occasional stooping, crouching, and crawling only, the vocational expert concluded that the hypothetical person retains the RFC to perform the jobs of information clerk, telephone solicitor (both of which are sedentary and semi-skilled positions) and order clerk (a sedentary and unskilled position).  AT 526-29.  Accordingly, the ALJ listed these positions as those available to and capable of being performed by the plaintiff despite her limitations.  AT 19.

Plaintiff's primary argument is that there are no facts in the record to support the her ability to hold a semi-skilled job.  Indeed, the next hypothetical presented by the ALJ at the hearing combined the same facts as the prior question, but added as an additional fact that the hypothetical person had frequent problems with understanding, remembering, and carrying out detailed instructions, dealing with work stresses, and responding to changes in the work setting.  AT 529.  The vocational expert opined that this hypothetical would in fact eliminate the semi-skilled positions, thus leaving only the position of order clerk, but also noting that an accounts clerk would satisfy these modified restrictions.  *Id.*

The additional restrictions that the ALJ added in this second hypothetical more correctly reflect the actual capabilities of the plaintiff.  *See* AT 317-318.  The mental RFC, completed by Dr. Newman, lists plaintiff as having a markedly limited ability to understand, remember, and carry out detailed instructions.  AT 317.  When the ALJ relied on the vocational expert's response to the first hypothetical in making his decision he did not fully take into account the plaintiff's impairments.  A hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational

expert testimony.  *Bosmond v. Apfel,* No. 97 Civ. 4109, 1998 WL

851508, at *8 (S.D.N.Y. Dec. 8,1998) (citation omitted); *see also De*

*Leon v. Sec'y of Health and Human Servs.,* 734 F.2d 930, 936 (2d

Cir.1984).   Accordingly, I conclude that certain of the hypotheticals

posed to the expert were improper and, as a result, the ALJ relied

upon an inadequately proposed hypothetical to support a conclusion of

no disability.  *See Kuleszo*, 232 F.Supp.2d at 57 (W.D.N.Y. 2002).

Further, after the ALJ lists the plaintiff's RFC in his decision,

including those impairments that limit her ability to perform semi-skilled

work, he still identifies the semi-skilled positions of information clerk

and telephone solicitor in the list of jobs existing in significant numbers

in the national economy.  AT 19.  The expert's opinion regarding those

positions depends for its validity upon the ALJ's RFC finding.  Since I

have already recommended that the RFC determination be rejected, I

similarly recommend a finding that the vocational expert's opinions are

flawed.  *See Owens v. Astrue*, No. 5:06-cv-736, 2009 WL 3698418, at

*8 (N.D.N.Y.  Nov. 3, 2009) (Mordue, C.J.) (citing *Hill v. Astrue,* 2007

WL 4741371, at *6 n.4 (D.Kan.2007)) (citations omitted).

In short, these deficiencies, combined with the court's finding

that in any event the ALJ's RFC determination was flawed based upon

his improper rejection of treating source information and plaintiff's

subjective complaints of pain, warrant reversal of the ALJ's

determination.

IV.     SUMMARY AND RECOMMENDATION

        While the ALJ in this case appears to have considered all of the

relevant medical evidence bearing upon plaintiff's conditions and

resulting limitations, his RFC finding is not supported by substantial

evidence in the record, particularly with respect to the weight assigned

to the opinions of the plaintiff's treating sources and his rejection of

plaintiff's subjective claims regarding her limitations.  Those errors

resulted in the ALJ's reliance on the vocational expert's response to

his flawed hypothetical.  For these reasons, the Commissioner's

determination should be reversed and the matter remanded for further

proceedings consistent with this opinion.[29]

---

[29]     Although plaintiff seeks remand solely for the calculation of benefits,
such course of action is not appropriate in this case.  Reversal and remand for the
calculation of benefits is warranted only "when there is 'persuasive proof of
disability' [in the record] and further development of the record would not serve any
purpose."  *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 418 (W.D.N.Y. 2006)
(quoting *Rosa*, 168 F.3d at 83).  Remand for further consideration, on the other
hand, is justified when the ALJ has applied an improper legal standard, or further
findings and explanations would clarify the ALJ's decision.  *See Rosa*, 168 F.3d at

RECOMMENDED that plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability be VACATED, and the matter REMANDED to the agency for further consideration.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of Court within fourteen days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1) (2006); FED. R. CIV. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

---

82-83; *Parker,* 626 F.2d at 235; *Steficek*, 462 F. Supp. 2d at 418 (citing *Pratts,* 94 F.3d 39).

In this instance, remand is required for the purpose of making further findings and offering additional explanation of the evidence, and not because of a finding that there is persuasive proof of disability in the existing record. Accordingly, while not unsympathetic to the fact that this matter has been pending since February of 2003, when plaintiff first made her application for SSI benefits, and she has been through two separate administrative hearings, based upon the record now before the court I am unable to recommend a course which would result in a directed finding of disability.

IT IS FURTHER ORDERED that the Clerk of the Court serve a copy of

this report and recommendation upon the parties in accordance with

this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     June 14, 2010
           Syracuse, NY